## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **TARRIFY PROPERTIES, LLC, et al,** | **CASE NO. 1:19-CV-002293-JG** |
| Plaintiffs, | **JUDGE JAMES GWIN** |
| v. | **PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| **CUYAHOGA COUNTY, OHIO,** | |
| Defendant. | |

Plaintiffs Tarrify Properties LLC and Denise Gutta (collectively, "Plaintiffs"), individually, and on behalf of others similarly situated, through counsel, move this Court for an order certifying this matter as a class action, pursuant to Fed. R. Civ. P. 23 ("Rule 23"). Plaintiffs seek certification of a class (the "Class") of similarly situated individuals and entities, defined as follows:

> All persons whose interest in real property located in Cuyahoga County, Ohio was directly transferred to another entity through the invocation and use of the procedures set forth in O.R.C. § 323.78, where the total value of that property exceeded the amount of the impositions on that property at the time the transfer occurred.

The bases in support of Plaintiffs' Motion are fully contained in the foregoing Memorandum incorporated herein by reference.

WHEREFORE, Plaintiffs Tarrify Properties LLC and Denise Gutta, individually, and on behalf of all others similarly situated, move this Court to certify the Class described herein and for all other relief this Court may deem just and proper.

Respectfully Submitted,

/s/ Marc E. Dann
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Emily White (0085662)

DannLaw
P.O. Box. 6031040
Cleveland, Ohio 44103
(216) 373-0539 telephone
(216) 373-0536 facsimile
*notices@dannlaw.com*

Charles Gruenspan (009852)
Charles Gruenspan Co., LPA
601 Commerce Park Square Four
23240 Chagrin Blvd.
Cleveland, OH 44122
(216) 595-6300 telephone
(216) 595-6307 facsimile
*cgruenspanlpa@gmail.com*

Thomas A. Zimmerman, Jr.
(admitted *pro hac vice*)
Matthew C. De Re
(admitted *pro hac vice*)
Zimmerman Law Offices, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile
www.attorneyzim.com
*firm@attorneyzim.com*

*Counsel for Plaintiffs and the Putative Class*

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................... 1

II.   LEGAL BACKGROUND. ................................................................................. 1

    A.    Tax Foreclosures Prior to 2006 ............................................................. 1

    B.    The Statute ............................................................................................. 3

        1.    The Statute Permits Counties to Forego Tax Collection ...................... 3

        2.    The Statute's Purpose Is to Foster Economic Development ................. 5

III.  STATEMENT OF FACTS ................................................................................. 7

    A.    Cuyahoga County's Direct transfer Tax Foreclosure Process ............................ 7

    B.    The Land Bank ....................................................................................... 8

    C.    Plaintiffs' Foreclosure Cases and transfers ...................................... 10

        1.    Plaintiff Tarrify Properties, LLC .................................................. 10

        2.    Plaintiff Denise Gutta ................................................................. 11

    D.    Similar Foreclosure Cases and Transfers ......................................... 11

        1.    The Transfer History Spreadsheet ............................................... 13

        2.    The Tax History Spreadsheet ...................................................... 13

        3.    Valuation for Selected Parcels Spreadsheet ............................... 14

        4.    Impositions for Selected Parcels Spreadsheet ............................ 15

IV.   LEGAL STANDARD ....................................................................................... 15

V.    ARGUMENT ..................................................................................................... 17

A.    Numerosity ........................................................................................... 17

B.    Commonality and Typicality ............................................................... 17

C.    Adequacy of Representation ............................................................... 20

D.    Predominance ...................................................................................... 21

E.    Superiority ........................................................................................... 23

F.    Ascertainability ................................................................................... 24

G.    The Pending Motion to Dismiss. ....................................................... 25

VI.    CONCLUSION ................................................................................................ 25

## TABLE OF AUTHORITIES

### Cases

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997) ...................................................................................... 16

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,*
    568 U.S. 455 (2013) ................................................................... 17, 19, 23, 25

*Beattie v. CenturyTel, Inc.,*
    511 F.3d 554 (6th Cir. 2007) ...................................................................... 22

*Bell v. PNC Bank, Nat. Ass'n,*
    800 F.3d 360 (7th Cir. 2015) ...................................................................... 17

*Bridging Communities Inc. v. Top Flite Fin. Inc.,*
    843 F.3d 1119 (6th Cir. 2016) ........................................................ 18, 19, 21

*Butler v. Sears, Roebuck & Co.,*
    727 F.3d 796 (7th Cir. 2013) .................................................................. 22, 23

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013) ................................................................................ 22, 23

*Cross v. Nat'l Trust Life Ins. Co.,*
    553 F.2d 1026 (6th Cir. 1977) .................................................................... 21

*Daffin v. Ford Motor Co.,*
    458 F.3d 549 (6th Cir. 2006) ...................................................................... 17

*Davidson v. Henkel,*
    302 F.R.D. 427 (E.D. Mich. 2014) .............................................................. 17

*Direct Mktg. Ass'n v. Brohl,*
    575 U.S. 1 (2015) ................................................................................. 3, 4, 6

*Dunn v. City of Chicago,*
    231 F.R.D. 367 (N.D. Ill. 2005) ................................................................. 18

*Edwards v. First Am. Corp.,*
    289 F.R.D. 296 (C.D. Cal. 2012) ................................................................ 24

*Galoski v. Applica Consumer Products,*
    309 F.R.D. 419 (N.D. Ohio 2015) .............................................................. 16

*General Tel. Co. v. Falcon,*
    457 U.S. 147 (1982) ................................................................................... 16

*Gulf Oil Co. v. Bernard,*
    452 U.S. 89 (1981) ................................................................................................................ 15

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) .............................................................................................. 22

*In re Allstate Ins. Co.,*
    400 F.3d 505 (7th Cir. 2005) ................................................................................................ 25

*In re American Medical Sys., Inc.,*
    75 F.3d 1069, 1079 (6th Cir. 1996) ................................................................................ 16, 20

*In re Golden,*
    190 B.R. 52 (Bankr. W.D. Pa. 1995) .................................................................................. 3, 4

*In re Inter-Op Hip Prosthesis Liab. Litig.,*
    204 F.R.D. 330 (N.D. Ohio 2001) ........................................................................................ 21

*In re School Asbestos Litigation,*
    789 F.2d 996 (3rd Cir. 1986) ................................................................................................ 22

*In re Scrap Metal Antitrust Litig.,*
    527 F.3d 517 (6th Cir. 2008) ................................................................................................ 19

*In re Whirlpool Corporation Front-Loading Washer Products Liability Litigation,*
    722 F.3d 838(6th Cir. 2013) .......................................................................................... passim

*Keele v. Wexler,*
    149 F.3d 589 (7th Cir.1998) ................................................................................................. 18

*Kelo v. City of New London, Conn.,*
    545 U.S. 469 (2005) ............................................................................................................ 5, 6

*Leyva v. Medline Indus. Inc.,*
    716 F.3d 510 (9th Cir. 2013) ................................................................................................ 19

*Messner v. Northshore Univ. HealthSystem,*
    669 F.3d 802 (7th Cir. 2012) .......................................................................................... 23, 25

*NorCal Tea Party Patriots v. I.R.S.,*
    2016 WL 223680 (S.D. Ohio 2016) ..................................................................................... 20

*Palombaro v. Emery Fed. Credit Union,*
    2017 WL 3437559 (S.D. Ohio 2017) .............................................................................. passim

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan,*
    654 F.3d 618 (6th Cir. 2011) ................................................................................................ 23

*Rikos v. The Procter & Gamble Company,*
    799 F.3d 497 (6th Cir. 2015)..................................................................... 24

*Robinson v. Fountainhead Title Group Corp.,*
    252 F.R.D. 275 (D. Md. 2008)................................................................... 22

*Rodriquez v. Berrybrook Farms, Inc.,*
    672 F.Supp. 1009 (W.D. Mich. 1987) ...................................................... 17

*Roman v. Korsan,*
    152 F.R.D. 101, (W.D. Mich. 1993)........................................................ 17

*Romberio v. Unumprovident Corp.,*
    385 Fed.Appx. 423 (6th Cir. 2009) ........................................................ 16

*Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.,*
    863 F.3d 460 (6th Cir. 2017).................................................................... 21

*Spears v. First Am. eAppraiseIT,*
    2014 WL 4647679 (N.D. Cal. 2014) ....................................................... 25

*Sterling v. Velsicol Chem. Corp.,*
    855 F.2d 1188 (6th Cir. 1988).................................................................. 23

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011).................................................................... 18, 22, 23

*Young v. Nationwide Mut. Ins. Co.,*
    693 F.3d 532 (6th Cir. 2012)............................................... 18, 19, 20, 24

## **Statutes**

O.R.C. § 323.25............................................................................................... 2

O.R.C. § 323.28............................................................................................... 2

O.R.C. § 5721.20............................................................................................. 2

O.R.C. § 5722.01............................................................................................. 3

O.R.C. § 5723.04............................................................................................. 2

O.R.C. § 5723.06............................................................................................. 2

O.R.C. § 5723.07............................................................................................. 2

O.R.C. §§ 1724.01, *et seq.* ............................................................................. 8

O.R.C. §§ 323.65, *et seq.* ................................................................................. 3, 4, 5, 14

**<u>Rules</u>**

Fed. R.Civ. P. 23 ................................................................................. passim

## I.      INTRODUCTION

In this case, Plaintiffs, individually, and on behalf of the putative Class, allege that Defendant Cuyahoga County, Ohio ("County" or "Defendant"), through its appointed "Board of Revision," engaged in economic development activity by taking certain tax delinquent vacant properties and transferring[1] them to other political subdivisions, including, but not limited to, the Cuyahoga County Land Reutilization Corporation (the "Land Bank"). Plaintiffs and putative Class members each held title to a property (or properties) subject to foreclosure proceedings before the Board of Revision, at the conclusion of which the Board of Revision entered an order authorizing the Sheriff's Department of Cuyahoga County to, after waiting 30 days, prepare and record a deed transferring the property to a designed political subdivision.

These transfers were made without providing compensation to the former owners of those properties to account for the surplus value of the properties that exceeded the alleged unpaid tax impositions ("Surplus Equity"). It is undisputed that no taxes were collected in the process, and the purpose of the transfers was to foster economic redevelopment.  *See*, Section II, *infra*.

This case is perfectly suited for Class treatment because it presents almost exclusively common questions which predominate the claims of Plaintiffs and the members of the Class, and the County maintains detailed, easily accessible, and reviewable records which can be used to determine Class membership and damages.  Therefore, the Court should grant the Motion.

## II.     LEGAL BACKGROUND.

### A.      Tax Foreclosures Prior to 2006

Prior to 2006, all Ohio tax foreclosures were exclusive about collecting taxes and were conducted in the Court of Common Pleas pursuant to a process that required a foreclosed-upon

---

[1] The terms "transfer," "transfers," "transferring," "transferred," etc., when used both as a noun and a verb, shall refer to the transfers at issue in this case, or the County's act of transferring properties to other political subdivisions, which is at issue in this case.  *See*, Section II, *infra*.

1

property to be offered for sale, with the proceeds of the sale used to satisfy any delinquent taxes or liens. *See, e.g.*, O.R.C. § 323.25 ("The county treasurer shall enforce the lien for such taxes by civil action…for the sale of such premises, in the court of common pleas of the county in the same way mortgage liens are enforced.") (as effective March 11, 2014 through September 11, 2008); O.R.C. § 323.28(B) (as effective May 25, 1994 through September 11, 2008). Under that scheme, if a foreclosed-upon property was sold for an amount that exceeded the amount of its tax delinquency, the excess sales proceeds—*i.e.*, Surplus Equity—were to be paid to the former property owner.[2] O.R.C. § 323.28(B) ("Any [remaining] balance [after tax sale] shall be distributed according to Section 5721.20 of the Revised Code") (as effective May 25, 1994 through September 11, 2008); O.R.C. § 5721.20 ("Residue of moneys from the sale or foreclosure of lands remaining to the owner…shall [be] retain[ed], and upon demand by such owner, [the treasurer] shall pay such excess to him.") (as effective prior to April 7, 2009).

In short, the Ohio tax foreclosure process as it existed prior to 2006 permitted counties to sell tax delinquent properties, collect delinquent tax amounts—but only those amounts—from the proceeds, and vested the former property owners and lienholders with the right to receive any Surplus Equity. The only time a former property owner would not be able to recover any Surplus Equity was after his property was *repeatedly* exposed to the market, and the *market* determined that no Surplus Equity existed. O.R.C. § 323.28 (as effective May 25, 1994 through September 11, 2008). This is consistent with the general principles of taxation, as tax "collection" refers to "the act of obtaining

---

[2] If a foreclosed-upon property was not sold "after being offered for sale on two separate occasions," then it would be forfeited to the state. O.R.C. § 323.28(D) (as effective May 25, 1994 through September 11, 2008). However, such a forfeiture would only occur *after* a property was twice exposed to the market, or, in other words, after the market determined that the property's value was less than the minimum purchase price offered—*i.e.*, the amount of impositions thereon. O.R.C. § 323.28(A) and (D) (as effective May 25, 1994 through September 11, 2008). Even then, the forfeited property would be continually offered for sale until unpaid tax amounts were collected. *E.g.*, O.R.C. §§ 5723.04, 5723.06, 5723.07 (as effective March 27, 1991 through September 11, 2008); *see also* Gus Frangos ("Frangos") deposition transcript ("Frangos Dep."), attached hereto as Exhibit A, 14:19-16:2. As such, the tax collection process would continue until taxes were, in fact, collected.

payment of taxes due," but *only* the taxes that are due, because those amounts are the only property to which the government is entitled. *E.g.*, *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 10 (2015); *In re Golden*, 190 B.R. 52, 57-58 (Bankr. W.D. Pa. 1995) ("[A] tax sale[] only seeks to collect from the debtors their fair share of the tax burden.").

**B.    The Statute**

While counties still have the option of engaging in tax collection using the foregoing foreclosure and sales procedures, the Ohio General Assembly enacted O.R.C. §§ 323.65, *et seq.* (the "Statute") in 2006 to give counties another alternative relative to "abandoned" tax delinquent properties—as defined by O.R.C. 323.65(A).  Frangos Dep., 16:3-5.  Under the Statute, counties are permitted to commence tax foreclosure proceedings before county boards of revision—as opposed to the Court of Common Pleas—and are *not* required to offer foreclosed-upon properties for sale at public auction for the purpose of collecting taxes.  As explained below, the Statute allows counties to *forego* tax collection, and directly transfer properties to county land reutilization corporations or other political subdivisions— as defined in O.R.C. § 5722.01—for the purpose of redevelopment in lieu of tax collection.  *E.g.*, O.R.C. § 323.71(A)(1); O.R.C. § 323.73(G); O.R.C. § 323.78.

**1.    The Statute Permits Counties to Forego Tax Collection**

Direct transfers under the Statute may be ordered in two circumstances: (1) if the total amount of the impositions owed (*i.e.*, all taxes, assessments, and other amounts certified as a lien against the property) exceed the fair market value of the real property (O.R.C. § 323.71(A)(1); O.R.C. § 323.73(G)); or (2) if a county treasurer invokes the "alternative redemption period" pursuant to O.R.C. § 323.78, regardless of whether the fair market value of the property exceeds the total amount of impositions owed. This lawsuit involves the second of these circumstances, which differs from the tax collection and foreclosure procedures that existed prior to 2006 in several key respects.

First, when title to property is transferred to a county land reutilization corporation or an electing subdivision pursuant to O.R.C. § 323.78, the entity receiving the property does not pay *any*

3

*consideration* for the property that is applied towards delinquent tax amounts.  Frangos Dep., 20:13-20, 24:13-20.  Indeed, O.R.C. § 323.78(B) provides that upon such direct transfer of a foreclosed property, the property is transferred "free and clear of all impositions and any other liens on the property, which shall be deemed forever satisfied and discharged."  Therefore, unlike under the tax foreclosure scheme in place prior to 2006—which *always* resulted in tax collection—direct transfers under the Statute *never* result in the collection of taxes.  *See*, Section II-A, *supra*.

Second, title to a property may be transferred to a county land reutilization corporation or an electing subdivision that has indicated a desire to acquire the property without ever being exposed to the market.  O.R.C. § 323.78 ("If a municipal corporation, township, county, school district, community development organization, or county land reutilization corporation has requested title to the parcel, then…the parcel shall be transferred by deed directly to the requesting [entity] without appraisal and without a sale.").  In other words, a county does not even have to *attempt* to collect any taxes, as it was previously required to do—repeatedly, until taxes were, in fact, collected—under the statutory scheme in place prior to 2006.  *See*, Section II-A, *supra*.

Finally, the Statute does not provide for the recovery of any Surplus Equity to the former owners of transferred properties, even where the fair market value of the property exceeds the total amount of impositions owed—*i.e.*, where Surplus Equity exists.  O.R.C. § 323.78(B).  In contrast, the tax foreclosure scheme in place prior to 2006 *always* permitted former owners of foreclosed-upon properties to recover Surplus Equity (when it existed).  *See*, Section II-A, *supra*.

These three differences make clear that the foreclosure process that was in place prior to 2006 has *all* of the features of tax collection, while the transfer process under the Statute has *none* of them. *See*, Section II-A, *supra* (noting that "tax collection" is defined by the actual—or at least, attempted— collection of taxes, and is limited to the collection of only the amounts that are owed) (citing *Direct Mktg.*, 575 U.S. at 10; *In re Golden*, 190 B.R. at 57-58).  Accordingly, when the County engages in a direct transfer pursuant to O.R.C. § 323.78, it *foregoes* tax collection.

4

### 2.     The Statute's Purpose Is to Foster Economic Development

Although the transfers at issue in this case have *none* of the characteristics of tax collection, they do have several characteristics of another type of governmental power: eminent domain.  For example, the enabling statutes (and articles of incorporation) for both land reutilization programs and county land reutilization corporations—to whom transfers are made—make clear that these programs and entities are designed to promote economic redevelopment and/or acquire land for public use.  O.R.C. § 5722.02(A) (land reutilization programs are designed to "facilitate the effective reutilization of nonproductive land"); O.R.C. § 1724.01(B) (listing the purposes of county land reutilization corporations, all of which concern "the reclamation, rehabilitation, and reutilization" of real property to promote "economic and housing development"); *see also*, Section III-B, *infra*.

While it is axiomatic that the economic redevelopment of land will—if successful—*eventually* lead to the collection of taxes *in the future*, this downstream benefit does not alter the fundamental purpose of the transfers, which is economic development.  Indeed, if such were the case, *every* exercise of the eminent domain power could be considered an exercise of the taxing power.  *E.g.*, *Kelo v. City of New London, Conn.*, 545 U.S. 469, 483 (2005) (holding that the eminent domain power was implicated precisely because the "economic development plan" at issue would "provide appreciable benefits to the community, including—but by no means limited to—new jobs and *increased tax revenue*") (emphasis added).

The Ohio legislature understood this distinction as well.  For example, O.R.C. § 5722.02(A)—which provides for the establishment of land reutilization programs—uses the phrase "*return…*to tax revenue generating status," which demonstrates the legislature's understanding that until a land reutilization program accomplishes its goal of "return[ing] nonproductive land to tax revenue generating status"—which necessarily occurs after a transfer is completed—no tax revenue is being generated, and therefore, no tax collection is involved.

In fact, Frangos—who was involved in drafting the Statute—admitted during his deposition

that "this whole scheme [*i.e.*, the Statute] was developed to try to be a remedy, an *alternative*, to collection," and that no taxes at all are collected at the time of transfer.  *E.g.*, Frangos Dep., 17:22-20:20, 24:13-20.  Although Frangos repeatedly attempted to characterize the transfers as relating to "tax collection," that characterization was based upon his conflation of the act of collecting taxes with the concept of expanding the tax base through redevelopment—which may ultimately, but not directly, lead to increased tax revenue.  *Id.*  Indeed, a review of Frangos's testimony makes clear that he was not using the phrase "long-term collection" in reference to "the act of obtaining payment of taxes due" (*Direct Mktg.*, 575 U.S. at 10), but was instead referring to the "expansion of the tax base" through redevelopment—*i.e.*, "when a property is put back into productive use."  *E.g.*, Frangos Dep., 17:22-20:20, 24:13-20; *see also*, Frangos Dep., Exhibit 2, ¶ 4 (Frangos affidavit stating that the purpose of the transfers is to "cleanse title and repurpose properties," indicating that they are related to taxation in name only).  In other words, "you have short-term collection"—*i.e.*, governmental actions that directly result in the collection of taxes, such as collecting taxes through the tax foreclosure process described in Section II-A, *supra*—but  "this [*i.e.*, the transfers] is long-term collection, expansion of the tax base." *Id.*

While Frangos may "view it [*i.e.*, the transfers] as, ultimately, a collection," his legal conclusion on that point is incorrect because, as noted above, transferring properties for the purpose of receiving "increased tax revenue" *in the future* is not really tax collection at all, it is redevelopment through the use of the eminent domain power.  *Kelo*, 545 U.S. at 483.  Yet, in spite of the fact that the transfers pursuant to R.C. 323.78(B) are an exercise of the eminent domain power—which necessitates the payment of just compensation—former owners of foreclosed-upon properties, such as Plaintiffs and Class members, receive *nothing* in connection with those transfers.  Therefore, Plaintiffs allege that the transfers violate the Fifth Amendment to the United States Constitution, and Art. I, Section 19 of the Ohio Constitution.

6

III.    **STATEMENT OF FACTS**

A.      **Cuyahoga County's Direct transfer Tax Foreclosure Process**

Since 2009, the County has used the foreclosure process authorized by the Statue to directly transfer thousands of tax delinquent properties to the Land Bank (and other similar entities) for economic redevelopment.  As described by Mary Beth Smith ("Smith")—the employee of the County Treasurer's office primarily tasked with testifying at Board of Revision foreclosure hearings (*See* Smith deposition transcript ("Smith Dep."), 12:20-23, 27:13-22, attached hereto as Exhibit B)—this process is uniform, and the County maintains detailed records regarding these foreclosure cases and their dispositions.

Specifically, as a witness at the Board of Revision hearings, Smith would testify regarding information she recorded on worksheets she created, which included information relative to a given parcel's market value and impositions.  Smith Dep., 22:22-23:5, 24:15-20, 61:12-14. Smith obtained all of the information on her worksheets from the County's MVP system (*i.e.*, a computerized database maintained by the County), the prosecutor's office, and the clerk of courts.   Smith Dep., 23:13-18, 36:6-9.  When testifying to a particular property's market value, Smith always used the auditor's appraised market value, and never used or considered any other valuation. Smith Dep., 24:5-13, 26:2-8.  Smith handled every case before the Board of Revision the same way. Smith Dep., 26:9-12; 58:23-25, 59:23-25, 63:16-64:1.

In addition to her worksheets, Smith prepared the "Order of Adjudication" and "Order to Sheriff" for each case.  Smith Dep., 28:3-17.  Smith prepared those documents using a template into which she would insert a property's unique parcel number, the defendant's name, and the foreclosure case number.  Smith Dep., 28:3-17; 39:15-40:1.  Smith would also document the results of each Board of Revision foreclosure hearing in a memo and enter the hearing results in an Excel spreadsheet.[3] Smith

---

[3] An example hearing results memo is attached as Exhibit 1E to the Smith Dep., and is discussed at 31:22-32:8.

Dep., 30:21-22, 32:9-13. Smith would then provide these hearing results memos to the prosecutor's office and the Land Bank staff. Smith Dep., 33:15-22.  According to Smith, these documents, and the procedures employed during Board of Revision foreclosure cases, have changed very little since 2015. Smith Dep., 29:1-17.

Relevant here, Smith stated that when the Board of Revision ordered a property to be directly transferred pursuant to O.R.C. § 323.78, she would use the shorthand designation "Direct ARR" in her records.  Smith Dep., 38:18-20, 44:3-10.  Smith used similar shorthand designations to denote the entity to whom a particular property was transferred, such as "CCLRC" for the Land Bank, and "CLE" for the City of Cleveland. Smith Dep., 44:15-45:2.

The orders issued by the Board of Revision also denote whether a property was transferred pursuant to O.R.C. § 323.78—*i.e.*, where a property's market value exceeded the impositions thereon— by including the following language:

> The BOR finds the plaintiff has petitioned the BOR to apply the alternative right of redemption to this case as prescribed in R.C. Sections 323.65(J) and 323.78; the BOR finds that the subject parcel therefore qualifies to be transferred without appraisal or public auction to a certificate holder under R.C. 323.69 or to a community development organization, municipal corporation, school district, land reutilization corporation, county or township as provided in R.C. 323.76(G), 323.74 and/or 323.65(K) and 323.78 as directed by any Order of transfer of this BOR pursuant to this Adjudication of Foreclosure; and upon hearing and due consideration, the BOR hereby grants said petition to invoke the alternative right of redemption under R.C. 323.65(J) and 323.78, and the same shall apply in this case.

Smith Dep. 50:24-51:9, and Exhibit 1 thereto, pp.1-2.

Accordingly, all of the properties at issue in this case—*i.e.*, those that were transferred pursuant to O.R.C. § 323.78—can be easily identified using Smith's records, as well as through a simple review of the applicable orders entered by the Board of Revision.

### B.     The Land Bank

The Land Bank is a not-for-profit corporation that was organized under O.R.C. §§ 1724.01, *et seq.* for the purpose of facilitating the reclamation, rehabilitation, and reutilization of vacant,

abandoned, tax-foreclosed or other real property within Cuyahoga County. (*See* Defendant's Answer to Plaintiffs' First Amended Complaint ("Answer"), Dkt. #28, ¶ 17). The Land Bank was incorporated by the County in 2009 upon a resolution adopted by the Cuyahoga County Board of Commissioners for the purposes set forth in O.R.C. § 1724.01.  *Id.*

On April 30, 2009, the Cuyahoga County Board of Commissioners adopted a resolution that designated the Land Bank to act as the County's agent under O.R.C. § 1724.10 and O.R.C. Chapter 5722 for the reclamation, rehabilitation, and reutilization of vacant, abandoned, tax foreclosed, and other property within the County. Id. ¶ 18. A copy of the Resolution is attached as Exhibit A to Plaintiffs' First Amended Complaint ("Complaint").  Dkt. # 20-1.

Thereafter, the Land Bank and the County entered into an Agreement and Plan that authorized the Land Bank to exercise on behalf of the County the powers granted by O.R.C. § 1724.02, O.R.C. § 1724.10, and O.R.C. Chapter 5722. *Id.* ¶ 19. A copy of the Agreement and Plan is attached as Exhibit B to the Complaint.  Dkt. # 20-2.  Under the Agreement, the Land Bank was designated by the County to, *inter alia*:

> a. Obtain, hold, and manage vacant, abandoned, or tax-foreclosed real property for reclamation, rehabilitation, and reutilization;
>
> b. Assist governmental entities and others to assemble, clear, and clear the title of vacant, abandoned, or tax-foreclosed real property;
>
> c. Promote economic and housing development in the County; and
>
> d. Advance, encourage, and promote the industrial, economic, commercial, and civic development in the County.

During his deposition, Frangos testified that "the primary purpose for the Land Bank is to get [properties] back in productive status," and that the collection of taxes, in the future, is a "collateral benefit."  Frangos, Dep. 17:25-19:23.  In other words, the purpose of the Land Bank and other similar organizations is "to *promote* tax collection" in the future by "expand[ing] the tax base" through "traditional community development."  *Id.*

9

### C.     Plaintiffs' Foreclosure Cases and transfers

The foreclosure process used with respect to the properties of the two Plaintiffs was the same as the uniform process described by Smith during her deposition.

### 1.     Plaintiff Tarrify Properties, LLC

On August 23, 2018, the Cuyahoga County Treasurer instituted a tax foreclosure case before the Board of Revision against Tarrify Properties, LLC ("Tarrify"), Case No. BR-18-017485 (the "Tarrify Foreclosure Case"). (Defendant's Motion To Dismiss For Lack Of Subject Matter Jurisdiction And Failure To State A Claim And/Or Motion For Judgment On The Pleadings ("Motion to Dismiss"), Dkt. # 13, Exhibit 5).  The property at issue in the Tarrify Foreclosure Case was titled to Tarrify and was located at 11600 Miles Avenue, Cleveland, Ohio (Parcel No. 138-13-001) (the "Tarrify Property"). *Id.*, Exhibit 5 at p. 7.

At the time the Tarrify Foreclosure Case was filed, the Cuyahoga County Fiscal Officer had certified the total value of the Tarrify Property at $176,800.00, and the total amount of outstanding taxes, assessments, and penalties owed on the Tarrify Property as $18,638.45. *Id.* p. 10.  On June 3, 2019, the Board of Revision issued two orders in the Tarrify Foreclosure Case: (1) *Adjudication of Foreclosure (Direct transfer–Alternative Right of Redemption)*, and (2) *Order to Sheriff: Order of Direct transfer To CCLRC Pursuant to R.C. 323.65(J); 323.78 With Alternative Right of Redemption*. Motion to Dismiss, Exhibits 7 and 9.

The *Adjudication of Foreclosure* in the Tarrify Foreclosure Case ordered that foreclosure was appropriate and applied the alternative redemption period of R.C. 323.78. *Id.*, Exhibit 7. The *Order to Sheriff* ordered the Sheriff to issue a deed transferring the Tarrify property to the Land Bank *after* the expiration of the 28-day redemption period. *Id.*, Exhibit 9. Pursuant to the *Adjudication of Foreclosure* and the *Order to Sheriff*, the Cuyahoga County Sheriff issued a deed transferring the property to the Land Bank after the 28-day redemption period expired. Answer, ¶ 32.

### 2.    Plaintiff Denise Gutta

On July 28, 2016, the Cuyahoga County Treasurer instituted a tax foreclosure case before the Board of Revision against Denise Gutta ("Gutta"), Case No. BR-16-012232 (the "Gutta Foreclosure Case").  (Defendant's Motion To Dismiss, Dkt. # 13, Exhibit 6).  The property at issue in the Gutta Foreclosure Case was titled to Gutta and located at 3709 Behrwald Avenue, Cleveland, Ohio (Parcel No. 011-08-010) (the "Gutta Property"). *Id.* Exhibit 6 at p. 7.

At the time the Gutta Foreclosure Case was filed, the Cuyahoga County Fiscal Officer had certified the total value of the Gutta Property at $68,000.00, and the total amount of outstanding taxes, assessments, and penalties owed on the Gutta Property as $7,510.30. *Id.* Exhibit 6, p. 11.   On November 4, 2016, the Board of Revision issued two orders in the Gutta Foreclosure Case: (1) *Adjudication of Foreclosure (Direct transfer)*, and (2) *Order to Sheriff: Order of Direct transfer R.C. 323.65(J); 323.78*. Motion to Dismiss, Exhibits 8 and 10. Both of these documents were fill-in-the-blank forms that simply required boxes to be checked.

The *Adjudication of Foreclosure* in the Gutta Foreclosure Case ordered that foreclosure was appropriate and applied the alternative redemption period of R.C. 323.78. *Id.*, Exhibit 8. The *Order to Sheriff* in that case ordered the Sheriff to issue a deed transferring the Gutta Property to the Land Bank *after* the expiration of the 28-day redemption period. *Id.*, Exhibit 10. Pursuant to the *Adjudication of Foreclosure* and the *Order to Sheriff*, the Cuyahoga County Sheriff issued a deed transferring the property to the Land Bank after the 28-day redemption period expired. Answer, ¶ 39.

### D.    Similar Foreclosure Cases and Transfers

As noted above, Defendant maintains detailed records that identify all properties that were directly transferred pursuant to O.R.C. § 323.78.   During discovery, the County produced these documents, which establish the number of properties subject to the transfers at issue, the market value of those properties at the time of the transfers, and the amount of the impositions against those

properties at the time of the transfers.[4]  Using this information, Defendant has shown that it can easily calculate the exact amount of the impositions owed at the time of the properties' direct transfer; thus, actual damages are easily calculated for each Plaintiff and Class member.

Specifically, the County produced two spreadsheets with a vast amount of data relating to properties that had been processed through the Board of Revision expedited foreclosure process between 2013 and 2019. One spreadsheet is entitled the Parcel Data Transfer History ("Transfer History"), and the other spreadsheet is entitled the Parcel Data Tax History ("Tax History"). The properties included in these spreadsheets were identified from the hearing results memos discussed below and produced by the County as Bates numbers C01 to C0658. *See* Deposition of Michael Sweeney ("Sweeney Dep."), 64:9-65:13; 68:17-69:4, attached hereto as <u>Exhibit C</u>.

Using the Transfer History and Tax History spreadsheets, Plaintiffs identified approximately 648 individual parcels that were subject to the transfers at issue, and provided the County with a list of associated "Parcel ID numbers" for those properties. Sweeney Dep. 107:5-108:9.  Plaintiffs requested that the County provide specific valuation and imposition data for each parcel as of the date the parcel was transferred pursuant to an order entered by the Board of Revision. In response, the County produced two additional spreadsheets: one showing the property valuations, and one showing the impositions on each property.

These four spreadsheets (*i.e.*, the Transfer History, Tax History, Valuation for Selected Parcels, and Impositions for Selected Parcels) (collectively, "Spreadsheets") comprised Exhibit 1 to Sweeney's deposition. Sweeney Dep., 105:17-106:5, and Exhibit 1 thereto. The salient data contained in these Spreadsheets were pulled from the County's "MVP system," which has been used since 2001. *Id.* 10:19-21.  The MVP system is used by governmental departments throughout Cuyahoga County and contains

---

[4] As discussed *infra*, these documents establish the numerosity and ascertainability of the Class, and demonstrate that Class members' damages can be easily determined, which supports a finding that predominance and superiority are satisfied.

all relevant information for real estate within the County: parcel numbers, ownership, transfer history, taxes, valuation, mailing information, etc. *Id.* 11:5-13. The tax information contained within the MVP system includes not only real estate taxes and values for individual properties, but also special assessments and interest and penalty charges. *Id.* 12:5-15.  An explanation of the information contained in these Spreadsheets was provided by Sweeney in his deposition and will be recounted more fully below.

### 1.     The Transfer History Spreadsheet

The Transfer History Spreadsheet details transfers of individual parcels of real estate in the County that were subject to the Board of Revision foreclosure process between 2013 and 2019. Sweeney Dep. 32:1-15. The data included on the Transfer History was generated from the County's MVP system. *Id.* 31:14-20. The key identifier for individual parcels of real estate is the Parcel ID. Sweeney Dep. 33:1-4. A Parcel ID is a unique eight-digit number assigned to each parcel of real estate within the County. *Id.* 32:22-33:4. A parcel ID is like a Social Security number for real property—no two parcels have the same Parcel ID. *Id.* 33:5-12. The Transfer History provides specific information with respect to each transfer of the listed parcels between 2013 and 2019. For example, the Transfer History includes the transfer date for each parcel, which is the date on which the deed transferring the parcel was recorded. Sweeney Dep. 38:6-16. It also identifies a reference number for each specific deed, which can be used to quickly locate a particular recorded deed. *Id.* 50:13-51:4.

### 2.     The Tax History Spreadsheet

The Tax History Spreadsheet was created in much the same way as the Transfer History. It includes the same properties referenced in the Transfer History. Sweeney Dep. 68:23-69:4. Sweeney testified that the information in the Tax History was kept in the ordinary course of the County's business and was accurate. *Id.* 67:12-23. The Tax History contains three categories of detailed information for the listed properties from 2013 to 2019. *Id.* 68:12-16.

First, the Tax History shows the name and address of the titled owners of the property for

each tax year. Sweeney Dep. 75:7-77:23. Second, the Tax History breaks down all possible categories of taxes, assessments, penalties, and interest charged against each parcel, as well as payments made by the property owner. Sweeney Dep. 85:6-101:2. The Tax History also collapses those figures into a single "Grand Total Owed," which is the amount of taxes owed on a parcel after the close of the tax year's collection period. *Id.* 101:8-102:3.

Finally, the Tax History includes the tax appraised values for each property. Pursuant to Ohio Revised Code, § 5713.01, County auditors are required to appraise all real estate in the County. In Cuyahoga County, the County's fiscal office assigns values to the land and improvements for each parcel. Sweeney Dep. 78:7-79:10; 80:15-24. Column AE on the Tax History spreadsheet—entitled "Tax Market Total"—lists the total appraised market value of the land and improvements for each parcel. *Id.* 80:25-81:10. The County relies on the appraised market values assigned to the parcels from the auditor's valuation process in the Board of Revision foreclosure proceedings. *Id.* 79:6-10; 80:19-24; 75:9-76:4.

Sweeney testified that a Treasurer's office representative attended all of the Board of Revision hearings, and that representative testified to the County's appraised market value of each parcel being foreclosed. Sweeney Dep. 82:1-8; 84:11-23.  Since this appraised market value constitutes prima facie evidence of a property's fair market value (O.R.C. § 323.71(B)), it becomes part of the Board of Revision's required findings during the foreclosure proceedings at issue (O.R.C. § 323.71(A)(1) (requiring the Board of Revision to make a finding of fact as to the market value of a property)). Accordingly, the appraised values set forth on the Tax History Spreadsheets reflected the judicially-determined market value of the properties at issue in this case.

### 3.    Valuation for Selected Parcels Spreadsheet

During discovery, Plaintiffs provided Defendant with a list of 648 Parcel ID Numbers and

transfer dates extracted from the Transfer History Spreadsheet.[5]  At Plaintiffs' request, the County specified the tax appraised market value and total actual impositions for each parcel as of the date of transfer. Sweeney Dep. 107:3-108:9.  This data was produced on the Valuation for Selected Parcels Spreadsheet, which reflects the appraised market values for the identified parcels at the time of the specified transfer, based on the auditor's most recent valuation. *Id.* 108:13-109:7.

### 4.      Impositions for Selected Parcels Spreadsheet

The Impositions for Selected Parcels Spreadsheet was created in the same way as the Valuation for Selected Parcels Spreadsheet, but shows the total impositions on the identified parcels at the time of the specified transfer. Sweeney Dep. 122:6-16. The total impositions comprised three amounts: (1) the total taxes, assessments, interest, and penalties owed; (2) the title examination costs; and (3) court costs. *Id.* 129:2-130:16. The total impositions figure was calculated by the County as of the day before the listed transfer date. *Id.* 123:14-18; 124:6-13.

Based on the information in the Impositions for Selected Parcels Spreadsheet and the Valuation for Selected Parcels Spreadsheet, each of the selected parcels had a tax appraised market value significantly in excess of the outstanding impositions at the time of its direct transfer after foreclosure. In other words, at the time of the transfers, the former owners of these properties had Surplus Equity.

While the Impositions for Selected Parcels Spreadsheet and the Valuation for Selected Parcels Spreadsheet only contains data with respect to a subset of the Class, the market values of, and the impositions against, the properties formerly owned by the remainder of the Class can easily be determined in the same way.

## IV.    LEGAL STANDARD

The decision to certify a class action is within the Court's discretion, but that discretion must be exercised within the framework set forth in Rule 23. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981).

---

[5] This selected parcels included Plaintiffs' properties.

15

Before certifying a class, a district court must conduct a rigorous analysis of the Rule 23 prerequisites. *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). The party moving for certification bears the burden of showing that the requirements for certification are met. *In re American Medical Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

To obtain class certification, Plaintiffs must first show that the four prerequisites of Rule 23(a) are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *In re Whirlpool Corporation Front-Loading Washer Products Liability Litigation*, 722 F.3d 838, 850 (6th Cir. 2013) (quoting Rule 23). If the threshold requirements of numerosity, commonality, typicality, and adequacy of representation set forth in Rule 23(a) are met, "parties seeking certification must also show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Id.*; *see also*, *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997).

Here, Plaintiffs seek to certify the Class pursuant to Rule 23(b)(3).  As such, Plaintiffs are required to demonstrate predominance—*i.e.*, that "the questions of law or fact common to class members predominate over any questions affecting only individual members"—and superiority—*i.e.*, that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

In addition to these explicit Rule 23 requirements, Plaintiffs recognize that courts in this Circuit have recognized that the ascertainability of class members is an implied prerequisite of Rule 23. *See*, *Romberio v. Unumprovident Corp.*, 385 Fed.Appx. 423, 431 (6th Cir. 2009); *Givens v. Van Devere, Inc.*, 2012 WL 4092738 (N.D. Ohio 2012); *Galoski v. Applica Consumer Products*, 309 F.R.D. 419 (N.D. Ohio 2015).

Importantly, decisions on class certification should not be conditioned on the merits of the case. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant

16

to determining whether the Rule 23 prerequisites for class certification are satisfied."[6]  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *In re Whirlpool*, 722 F.3d at 851.  A court may, however, go beyond the pleadings to the extent necessary to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.  *In re Whirlpool*, 722 F.3d at 852.

## V.     ARGUMENT

Given the many common legal issues presented by Plaintiffs and the Class, and in light of the discovery conducted in this matter, Plaintiffs meet all of the Rule 23 requirements for class certification, as set forth below.

### A.     Numerosity

Numerosity is satisfied if the "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  While the numerosity requirement is not tied to any fixed numerical threshold, "substantial" numbers usually satisfy this requirement.  *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006).  As one court within the Sixth Circuit recently noted, the trend for meeting the numerosity factor is to require a minimum of between 21 and 40 class members.  *May v. Blackhawk Mining LLC*, Case No. 15-cv-377-JMH, Memorandum Opinion April 3, 2017 at p. 2 (quoting *Davidson v. Henkel*, 302 F.R.D. 427, 436 (E.D. Mich. 2014)); *see also*, *Rodriquez v. Berrybrook Farms, Inc.*, 672 F.Supp. 1009, 1013 (W.D. Mich. 1987); *Roman v. Korsan*, 152 F.R.D. 101, 105-106 (W.D. Mich. 1993).  Here, as noted above, the Spreadsheets provided by Defendant during discovery indicate that at least 648 individual properties meet the Class definition.  *See*, Section III-D, *supra*.  Therefore, numerosity is satisfied.

### B.     Commonality and Typicality

The second and third Rule 23(a) prerequisites are commonality and typicality.  The

---

[6] "For example, a judge might need to determine if a class really has 10,000 members as a plaintiff alleges or only 10, as alleged by defendants."  *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 377 (7th Cir. 2015)

commonality requirement is satisfied when there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Common questions are those 'that can be proved through evidence common to the class.'" *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016) (quoting *In re Whirlpool*, 722 F.3d at 858). "To demonstrate commonality, the plaintiffs' 'claims must depend on a common contention...of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 542 (6th Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality is met if the Class members' claims are fairly encompassed by [Plaintiffs'] claims." *In re Whirlpool*, 722 F.3d at 852 (internal quotations omitted). Since "commonality and typicality are closely related, and finding one often results in finding the other," they will be addressed together. *Dunn v. City of Chicago*, 231 F.R.D. 367, 372 (N.D. Ill. 2005) (citing *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir.1998)); *Young*, 693 F.3d at 542 (noting that "commonality and typicality tend to merge") (internal quotations omitted); *In re Whirlpool*, 722 F.3d at 853 (same).

This case presents a singular, common issue of liability: whether the transfers amounted to a taking without just compensation—in violation of the Fifth Amendment to the United States Constitution, and Art. I, Section 19 of the Ohio Constitution—because Plaintiffs and Class members did not receive *any* compensation to account for their Surplus Equity. *See*, Section II, *supra*. As highlighted by the parties' briefing on Defendant's Motion to Dismiss (Dkt. ## 29, 31, 32, 45-47), that issue comes down to whether the County was engaged in tax collection or community development when it engaged in the transfers.

As made clear by Defendant's Motion to Dismiss, this issue underlies all Plaintiffs' and Class members' claims, and therefore, they "depend upon a common contention" that "will resolve an issue

18

that is central to the validity of each one of the claims in one stroke." *Palombaro v. Emery Fed. Credit Union*, 2017 WL 3437559, at *4 (S.D. Ohio 2017) (quoting *Dukes*, 564 U.S. at 350) (internal quotations omitted); *Young*, 693 F.3d at 542; *Bridging Communities*, 843 F.3d at 1124; *In re Whirlpool*, 722 F.3d at 858. Plaintiffs will use the common evidence discussed in Sections II and III, *supra* to demonstrate that no taxes were collected as a result of the transfers, and that those transfers were for the explicit purpose of community redevelopment and *not* tax collection. Using this evidence, the jury will be able to determine, on a classwide basis, whether the County's actions amounted to a taking in violation of the Fifth Amendment to the United States Constitution, and Art. I, Section 19 of the Ohio Constitution. *See, e.g.*, *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 719-21 (1999) (acknowledging that takings cases may present interrelated questions of fact and law, but holding that, as a general matter, such questions are to be determined by the jury); *McKay v. United States*, 199 F.3d 1376, 1383 (Fed. Cir. 1999) (whether government engaged in a taking is an issue of fact); *Lockary v. Kayfetz*, 908 F.2d 543, 547 (9th Cir. 1990) (same). Therefore, Plaintiffs' and Class members' claims "will prevail or fail in unison. In no event will the individual circumstances of particular Class members bear on [that] inquiry."[7] *Amgen*, 568 U.S. at 460; *In re Whirlpool*, 722 F.3d at 858-59.

While, for purposes of commonality, "there need be only one common question to certify a class," there are several other issues that can be determined on a classwide basis. *In re Whirlpool*, 722 F.3d at 853. For example, the fact that Plaintiffs and Class members suffered damages as a result of Defendant's conduct—such that Defendant is liable to Plaintiffs and the Class—is still a common question because it is susceptible to common proof. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008) ("The 'fact of damages' was a question common to the class even if the amount of damages sustained by each individual class member varied."); *In re Whirlpool*, 722 F.3d at 860 (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)); *see also*, *Palombaro*, 2017 WL 3437559 at

---

[7] This is true even if the Court disagrees with Plaintiffs' contentions on the merits, and ultimately grants Defendant's Motion to Dismiss (or any subsequent motion) as a matter of law. *See*, Section V-G, *infra*.

\*6. The issue of *whether* Plaintiffs and Class members suffered damages will be proven using common evidence because, as discussed above, Defendant has painstakingly documented the market value of, and the amount of impositions against, each transferred property on the date that the transfer was ordered.[8] *See*, Section III, *supra*. As such, Plaintiffs' and Class members' damages are also susceptible to "common proof of causation." *Young*, 693 F.3d at 543.

Since these issues are "central to all of [Plaintiffs'] claims and would advance the interests of the class as a whole," typicality is also satisfied.[9] *Young*, 693 F.3d at 543; *In re Whirlpool*, 722 F.3d at 852-53. Indeed, Plaintiffs' "interests are aligned with the interests of the represented Class members" because their claims, like those of the Class, depend upon the constitutionality of Defendant's taking of properties without compensation under the United States and Ohio constitutions. *In re Whirlpool*, 722 F.3d at 852-53. Therefore, both commonality and typicality are satisfied.

**C.      Adequacy of Representation**

As demonstrated through this memorandum, Plaintiffs adequately represent the Class because (1) their interests are not antagonistic to those of the Class they seek to represent; and (2) they will vigorously prosecute the interests of the Class through qualified counsel. *In re American Medical*, 75 F.3d at 1083. Indeed, based upon the record in this case, there is no dispute that Plaintiffs' interests are not antagonistic to those of the Class they seek to represent. Plaintiffs—each of whom had property seized by the Board of Revision for the purpose of economic development and blight removal without compensation—is in exactly the same position as the other members of the Class who also had their property seized for the purpose of economic development and blight removal without

---

[8] Although the precise *amount* of Plaintiffs' and Class members' damages may need to be determined individually, that issue can still be proven through common evidence because the County maintains and has access to data—*e.g.*, the Spreadsheets—that documents the appraised market value and amount of impositions on the date of the determination to transfer each property to a political subdivision (without collecting any taxes). *See*, Section III-D, *supra*.

[9] Regardless, "typical does not mean identical, and the typicality requirement is liberally construed." *Palombaro*, 2017 WL 3437559 at \*6 (quoting *NorCal Tea Party Patriots v. I.R.S.*, 2016 WL 223680, at \*8 (S.D. Ohio 2016)).

compensation.  Therefore, Plaintiffs are adequate Class representatives.

Plaintiffs' counsel are also adequate to represent the Class.  Adequacy of counsel focuses on counsels' competence and experience.  *Cross v. Nat'l Trust Life Ins. Co.*, 553 F.2d 1026, 1031 (6th Cir. 1977).  Plaintiffs' counsel have substantial experience in complex litigation and class action proceedings, and have the resources necessary to prosecute this litigation.  Marc Dann, Brian Flick and Emily White of DannLaw routinely litigate complex consumer cases in state and federal courts and have litigated class actions in state and federal courts.  *See*, firm bio for DannLaw, attached hereto as Exhibit D.  Thomas Zimmerman, Jr. and Matthew De Re of Zimmerman Law Offices, P.C. frequently litigate class actions in state and federal courts across the country.  *See*, firm bio for Zimmerman Law Offices, P.C., attached hereto as Exhibit E.  Plaintiffs' counsel have repeatedly been found to meet the Rule 23(a)(4) requirements in various certification decisions, and this case is no different.

### D.  Predominance

The first Rule 23(b)(3) factor is predominance, which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *Bridging Communities*, 843 F.3d at 1124.  "In discerning whether a putative class meets the predominance inquiry, courts are to assess the legal or factual questions that qualify each class member's case as a genuine controversy, and assess whether those questions are subject to generalized proof, and thus applicable to the class as a whole."  *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468 (6th Cir. 2017) (internal citations and quotations omitted).

For purposes of predominance, Plaintiff does not need to "prove that each element of a claim can be established by classwide proof."  *In re Whirlpool*, 722 F.3d at 858-59; *Bridging Communities*, 843 F.3d at 1124. Rather, Plaintiffs must show that "common questions *predominate* over any questions affecting only individual class members."  *In re Whirlpool*, 722 F.3d at 858 (emphasis in original) (internal quotations and alterations omitted); *Bridging Communities*, 843 F.3d at 1124; *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 345 (N.D. Ohio 2001) ("There may be cases in which resolution of one

21

issue or a small group of them will so advance the litigation that they may fairly be said to predominate.") (quoting *In re School Asbestos Litigation,* 789 F.2d 996, 1010 (3rd Cir. 1986)); *Butler v. Sears, Roebuck & Co.,* 727 F.3d 796, 801 (7th Cir. 2013); *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1022 (9th Cir. 1998) ("When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.").

Generally, where a common issue of liability exists, predominance is satisfied because the resolution of that common liability question is a legal predicate to engaging in individualized inquiries—*i.e.*, if the Class loses on a common issue of liability, then there is no need to reach individualized questions. *E.g., Butler*, 727 F.3d at 801 ("An issue central to the validity of each one of the claims in a class action, if it can be resolved in one stroke, can justify class treatment.") (quoting *Dukes*, 564 U.S. at 350); *In re Whirlpool*, 722 F.3d at 860; *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007). As such, courts have repeatedly noted that "the predominance standard is generally satisfied even if damages are not provable in the aggregate" because the "adjudication of questions of liability common to the class will achieve economies of time and expense." *E.g., Comcast Corp. v. Behrend*, 569 U.S. 27, 41 (2013); *In re Whirlpool*, 722 F.3d at 860-61; *Butler*, 727 F.3d at 801.

As noted above, there is a common, threshold question that will establish Defendant's liability to the Class in this case—*i.e.*, whether the transfers constituted takings without compensation in violation of the Ohio and United States constitutions—which will be answered through common evidence. *See*, Section V-B, *supra*. As such, this "issue of liability…is the core issue that may be resolved on a classwide basis." *Robinson v. Fountainhead Title Group Corp.*, 252 F.R.D. 275, 294 (D. Md. 2008). Indeed, this is a case where a wrongful scheme was perpetrated through the use of a common practice, such that Defendant's liability to Plaintiffs and the Class will not depend upon individual inquiries. *Palombaro*, 2017 WL 3437559 at *9 (holding that predominance was satisfied).  Therefore, the Class "will prevail or fail in unison. In no event will the individual circumstances of particular Class members

22

bear on [that] inquiry." *Amgen*, 568 U.S. at 460; *In re Whirlpool*, 722 F.3d at 858-59; *Dukes*, 564 U.S. at 350; *Butler*, 727 F.3d at 801; *Comcast*, 569 U.S. at 41.

Even if individualized issues relative to the *amount* of damages exist, it is well-settled that the existence of such issues does not defeat predominance. *Comcast*, 569 U.S. at 42 ("Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal."); *In re Whirlpool*, 722 F.3d at 861. In fact, "Rule 23(b)(3) itself contemplates that such individual questions will be present," and "requires only that those questions not predominate over the common questions affecting the class as a whole." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012); *Palombaro*, 2017 WL 3437559 at *6. Regardless, the precise measure of Plaintiffs' and Class members' damages can be easily determined from information in the County's possession. *See*, Section III-D, *supra*.

In sum, this is not a case "where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential Class member and [Defendant], and individual issues outnumber common issues." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988). Rather, "Defendant's liability can be determined on a classwide basis because [it emanates from] a single course of conduct which is identical for [Plaintiffs and the Class]," and class certification is "the best suited vehicle to resolve such a controversy." *Sterling*, 855 F.2d at 1197. Therefore, predominance is satisfied.

### E.     Superiority

The second Rule 23(b)(3) factor is superiority. Fed. R. Civ. P. 23(b)(3). "To determine whether a class action is the superior method for fair and efficient adjudication, the district court should consider the difficulties of managing a class action." *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 630 (6th Cir. 2011). Where, as here, "there are so many common issues of law and fact relating" to liability, "the superiority requirement likely poses no serious obstacle." *Messner*, 669 F.3d at 814 n. 5.

Plaintiffs do not foresee any manageability issues in this case, even with respect to determining

23

Class membership and/or the precise measure of Class members' damages.  Indeed, the former owner and value of, and the amount of impositions against, each property involved in each one of the transfers at issue is definitively established through the County's electronic records.  *See*, Section III-D, *supra*. This data can be easily sorted to both identify Class members *and* determine the amount of each of their claims.  *Id.*  Therefore, this case does not present any serious manageability concerns, and superiority is satisfied.

### F.     Ascertainability

Ascertainability requires that "the Class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young*, 693 F.3d at 532 (citations omitted). "The class must be susceptible of precise definition...For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." *Id. See also*, *Rikos v. The Procter & Gamble Company,* 799 F.3d 497 (6th Cir. 2015) ("In our circuit, the ascertainability inquiry is guided by *Young*...we noted that for a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria.").

Here, Class members can be easily identified, and doing so would not present any significant manageability issues.  As discussed in Section III-D, *supra*, "Plaintiff[s have] provided ample evidence that Defendant…maintain[s] extensive databases from which it should be possible to extract the necessary information" to determine Class membership.  *Edwards v. First Am. Corp.*, 289 F.R.D. 296, 305-06 (C.D. Cal. 2012); *Palombaro*, 2017 WL 3437559 at *11 (certifying a class where the plaintiffs "pointed to available documentation regarding the purported class members' loans as providing much of the information needed to determine whether a loan is covered by RESPA").  Plaintiffs have already identified 648 Class members using this data, and there is no reason to believe that the remainder of the Class cannot be identified in the same way.  *See*, Section III-D, *supra*.

24

Moreover, given the extensive information available in Defendant's records, any challenges to Class membership would be limited in quantity and scope.  *Spears v. First Am. eAppraiseIT*, 2014 WL 4647679, at *19 (N.D. Cal. 2014) ("The court does not foresee that such challenges would be frequent and predominate over the fundamental liability issue.").  Indeed, to determine whether an individual who claims to be a member of the Class is, in fact, a member of the Class, the Court would simply need to review the County's records to determine whether (1) that individual was the given property's owner prior to the transfer, and (2) whether that property had any Surplus Equity.  Therefore, the Class is ascertainable.

### G.    The Pending Motion to Dismiss.

Finally, Plaintiffs believe it is important to note that Class certification is appropriate, even if the Court is inclined to grant the Motion to Dismiss. As discussed above, the Court should not consider merits in deciding whether to certify the Class, and therefore, the Court's ultimate determination on the Motion to Dismiss has no bearing on the propriety of Class certification.  *Amgen*, 568 U.S. at 466 ; *In re Whirlpool*, 722 F.3d at 851; *Messner*, 669 F.3d at 811 ("The court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits."). If anything, the pendency of the Motion to Dismiss *supports* Class certification because it would allow the Court to determine whether the principle of comity bars federal jurisdiction—which is the core issue in this case—once and for all, instead of leaving that issue to be determined in any subsequent lawsuits filed by putative members of an uncertified Class.  *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005).  Therefore, Class certification is appropriate, even though the Court has yet to rule on the Motion to Dismiss.

## VI.    CONCLUSION

WHEREFORE Plaintiffs Tarrify Properties, LLC and Denise Gutta, individually, and on behalf of all others similarly situated, move this Court to certify the Class described herein, and for all other relief this Court may deem just and proper.

Respectfully Submitted,

/s/ Marc E. Dann
Marc E. Dann (0039425)
Brian D. Flick (0081605)
Emily White (0085662)
DannLaw
P.O. Box. 6031040
Cleveland, Ohio 44103
(216) 373-0539 telephone
(216) 373-0536 facsimile
*notices@dannlaw.com*

Charles Gruenspan (009852)
Charles Gruenspan Co., LPA
601 Commerce Park Square Four
23240 Chagrin Blvd.
Cleveland, OH 44122
(216) 595-6300 telephone
(216) 595-6307 facsimile
*cgruenspanlpa@gmail.com*

Thomas A. Zimmerman, Jr.
(admitted *pro hac vice*)
Matthew C. De Re
(admitted *pro hac vice*)
Zimmerman Law Offices, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile
www.attorneyzim.com
*firm@attorneyzim.com*

*Counsel for Plaintiffs and the Putative Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2020, a copy of the foregoing *Plaintiffs' Motion for Class Certification* was served upon counsel of record in this case via the U.S. District Court CM/ECF System.

/s/ Thomas A. Zimmerman, Jr.

Thomas A. Zimmerman, Jr.
(admitted *pro hac vice*)
Zimmerman Law Offices, P.C.

*Counsel for Plaintiffs and the Class*
